**NATIONAL GYPSUM COMPANY,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,**
Respondent.

No. 90–1574.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1992.

Decided June 19, 1992.

Stephen N. Shulman, with whom James W. Moorman, Laurence S. Kirsch, and Susan M. Mathiascheck, Washington, D.C., were on the brief, for petitioner.

Gary I. Rubin, Atty., Dept. of Justice, and George B. Wyeth, Atty., E.P.A., with whom Barry M. Hartman, Acting Asst. Atty. Gen. and Raymond Ludwiszewski, Acting Gen. Counsel, Lawrence Starfield, Acting Asst. Gen. Counsel, E.P.A., Washington, D.C., were on the brief, for respondent. Lewis M. Barr and Eileen T. McDonough, Attys., Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before: MIKVA, Chief Judge, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

The EPA seems unwilling to support its decisions with the necessary scientific findings. In yet another case involving the EPA and its National Priorities List (NPL), we have before us a petition for review challenging the Agency's decision to list the Salford Quarry, a waste site located in Pennsylvania. As we have had to do in several recent cases, *see e.g. Kent County, Delaware Levy Court v. EPA*, 963 F.2d 391 (D.C.Cir.1992); *Anne Arundel County, Maryland v. EPA*, 963 F.2d 412 (D.C.Cir.1992); *Tex Tin Corp. v. EPA*, 935 F.2d 1321 (D.C.Cir.1991), we vacate the listing decision and remand to the EPA in light of its failure to explain adequately the scientific basis for its decision as well as its failure to offer substantial evidence in support of its decision.

## I. BACKGROUND

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) requires the establishment of a list of national priorities among the known releases or threatened releases of hazardous substances in the United States. *See* 42 U.S.C. § 9605(a) (1988). Our previous decisions have fully discussed the National Priorities List (NPL) and the Hazard Ranking System (HRS), the method used to evaluate sites proposed for listing on the NPL. *See, e.g., Linemaster Switch Corp. v. EPA*, 938 F.2d 1299 (D.C.Cir.1991); *City of Stoughton v. EPA*, 858 F.2d 747 (D.C.Cir.1988).

The Salford Quarry, located in Lower Salford Township, Montgomery County, Pennsylvania, was an abandoned stone and aggregate quarry when American Olean Tile Company, Inc., bought it in 1963. American Olean, formerly a subsidiary of National Gypsum, used the quarry to dispose of fired and unfired tiles, "tile slurry," and other production wastes until sometime in 1980. The tiles and slurry located at the site apparently contain boron in the form of boron oxide.

In 1982, after two tanks containing tile slurry and fuel oil were found buried at the site, American Olean closed the quarry and installed two monitoring wells at the site. On January 22, 1987, an investigation revealed traces of boron in one of the quarry's monitoring wells and in a spring nearby. As a result, the EPA proposed the site for NPL listing based on an HRS score of 57.80. Meanwhile, in 1988, National Gypsum sold its subsidiary American Olean and acquired full ownership of the Salford quarry. The Salford Quarry was placed on the NPL on August 30, 1990.

National Gypsum's challenges to the EPA's listing decision focus on the EPA's evaluation of the Salford Quarry under the HRS. National Gypsum argues that the EPA incorrectly calculated the site's "waste characteristics" score by using the toxicity and persistence values for elemental boron and various unspecified (and highly toxic) boron compounds instead of boron oxide, the only compound actually

known to have been deposited at the quarry. National Gypsum contends that had the EPA evaluated the site's toxicity and persistence scores using only boron oxide, the HRS score for the site would have been well below the 28.5 required for listing on the NPL.

National Gypsum also challenges the EPA's determination that there was an "observed release" of boron and boron compounds at the site. The EPA based its finding of an observed release on the presence of boron found in a monitoring well at the site and in a spring nearby. National Gypsum claims that problems with the construction and location of the monitoring well render it an unreliable indicator of groundwater contamination. Furthermore, National Gypsum argues that quality control and assurance problems render the data from both the spring and the monitoring well unreliable.

Finally, National Gypsum challenges the EPA's calculation of the site's "population served" and "quantity" scores. Petitioner argues that the EPA misconstrued the provisions of the HRS by calculating the population served score using the number of people served by wells within a three mile radius of the site, rather than only those persons served by the single well nearest the site. Furthermore, National Gypsum contends that the EPA improperly used boron compounds, which are merely "pollutants or contaminants" and not "hazardous substances" as defined by CERCLA, in assessing the Salford Quarry's quantity score.

## II. ANALYSIS

### A. *The Salford Quarry's Waste Characteristics Score*

A facility's waste characteristics score reflects the toxicity, persistence, and quantity of the most hazardous substance present at the site that could migrate to groundwater. *See* 40 C.F.R. Pt. 300, App. A § 3.4 (1982) (amended at 40 C.F.R. Pt. 300, App. A (1991)) (unless otherwise noted, all references are to the original HRS promulgated in 1982). In evaluating a facility's waste characteristics score, the

EPA calculates the toxicity and persistence score for each contaminant at the site and combines the two highest scores in a matrix to derive a single numerical value. *Id.* The EPA then joins the toxicity/persistence score with the quantity score to arrive at a final waste characteristics score.

When the EPA tested groundwater in a monitoring well at the Salford Quarry, it found traces of boron. The test used by the EPA, however, did not disclose the chemical form of boron contained in the water. The Agency, therefore, based the site's toxicity and persistence scores on unspecified, highly toxic boron compounds. Relying on data from N.I. Sax's DANGEROUS PROPERTIES OF INDUSTRIAL CHEMICALS (the standard HRS reference used to determine the properties of various chemicals), the EPA assigned these boron compounds a toxicity score of 3 and a persistence score of 3, both the highest possible values for those categories.

In its comments, American Olean, and later National Gypsum, contested the EPA's decision to base the quarry's toxicity and persistence score on the highly toxic boron compounds. Referring to a report prepared by its consultant, American Olean asserted that boron oxide, a boron compound with low toxicity, was the only form of boron deposited in the Salford Quarry. *See Comments on the Proposed Listing of the Salford Quarry, Lower Salford Township, Pennsylvania, on the CERCLA National Priorities List*, at 2 (March 23, 1987) (Hereinafter *American Olean Comments*). [J.A. 210]. In fact, American Olean pointed out, the Agency's own records acknowledged that the fired and unfired tile disposed of in the Salford Quarry contained boron in the form of boron oxide. American Olean's comments further explained that, under the HRS, boron oxide would receive a toxicity value of 1, not the 3 warranted for other, more toxic boron compounds, and a persistence score of 0. National Gypsum echoed American Olean's concerns regarding the site's toxicity and persistence scores in its comments. *See Second Supplementary Comments on the Proposed Listing of the Salford Quar-*

*ry, Lower Salford Township, Pennsylvania on the CERCLA National Priorities List*, at 3 (April 25, 1989) (Hereinafter *National Gypsum Comments*).

The EPA never attempted to learn whether the boron in the groundwater at the Salford Quarry was boron oxide, other boron compounds, or boron in its elemental form. In its response comments explaining the Agency's decision to place the quarry on the NPL, the EPA stated:

> Although the Agency agrees that available information indicates that boron oxide was the boron-containing contaminant deposited at the site, the form of the boron subsequently detected in the monitoring wells is unknown. Agency analyses indicated the levels of elemental boron, not of any specific boron compound. There is no evidence to identify boron oxide as the specific form of boron detected in [the monitoring well] or the contaminated spring. Indeed, because this compound is only slightly soluble in water, it is unlikely it could account for the high concentrations observed in the aqueous samples used to document an observed release. Because of these factors, the Agency maintains that it is appropriate to consider both elemental boron and boron compounds in evaluating the HRS toxocity factor at this site.

*EPA's Response Comments*, at 3–139. [J.A. 325]. As for the site's persistence score, the EPA explained that, under the HRS, persistence is measured solely on the basis of biodegradability. The Agency concluded that "because neither boron nor boron oxide is biodegradable, a persistence factor value of 3 was correctly assigned." *Id.* at 3–140. We find the Agency's explanation of both the toxicity and persistence scores woefully lacking.

█ With regard to the toxicity score, the EPA provides no support for its conclusion that compounds other than boron oxide are present at the site. The EPA acknowledges that the only form of boron *known* to have been deposited at the site is boron oxide. The Agency reasons, however, that because boron oxide is only slightly soluble in water, it is "unlikely"

that the boron found in the groundwater was boron oxide. *EPA's Response Comments*, at 3–139. [J.A. 325]. But the Agency never explains why it is any *more* likely that the boron detected in the groundwater came from other, more highly toxic boron compounds. Even after thorough briefing and lengthy oral argument in this case, the EPA has failed to adequately explain its position regarding the boron found at the site.

At one point in its brief, the EPA argues that the boron oxide broke down into other, more toxic boron compounds. [EPA Brief at 15]. This appears to us, however, to be inconsistent with the EPA's assertion that boron oxide is only slightly soluble in water. *See EPA's Response Comments*, at 3–139. There may well be a scientific basis for the Agency's conclusion that a slightly soluble compound like boron oxide broke down into other boron compounds, and we would defer to such an explanation had it been given. *See Chemical Waste Management v. EPA*, 869 F.2d 1526, 1539 (D.C.Cir. 1989). But the EPA never explained, in any way, its conclusion that the boron oxide deposited at the site broke down to form the highly toxic (and presumably more soluble) boron compounds that the Agency assumes are now present there. The Agency has never even identified the type of boron compounds, more soluble and more toxic than boron oxide, that it presumes were formed by the boron oxide deposited in the quarry.

In fact, when faced with this dilemma at oral argument, counsel for the government seemed to shift to the argument that other boron compounds may have been deposited at the site. Once again, however, these musings have absolutely no basis in the record. The EPA itself has conceded that boron oxide is the only boron compound known to have been deposited at the Salford Quarry. *EPA's Response Comments*, at 3–139. The Agency insists that, given the preliminary nature of an NPL listing, it is entitled to *infer* that other forms of boron must be present at the facility. The EPA's inferences, however, are nothing more than unsupported assumptions, and our previous decisions recognizing the nec-

essarily cursory nature of the NPL listing process, *see e.g. Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 911 (D.C.Cir.1985) (hereinafter *Eagle–Picher I); City of Stoughton v. EPA,* 858 F.2d at 751, do not entitle the EPA to base a listing decision on unsupported assumptions.

We find the EPA's assumptions particularly frustrating in this case because it acknowledges that tests are available to determine the precise form of boron contained in the Salford Quarry's groundwater. While we do not suggest that the EPA must perform the additional tests, we do think that if the Agency refuses to do so it must at least give a reasoned explanation for its assumption that other boron compounds exist at the site. If the EPA cannot offer a satisfactory explanation for its inference that compounds other than boron oxide exist at the site, then it must offer substantial evidence upon which it could conclude that the highly toxic boron compounds are present there. Because the Agency failed to do either, we are persuaded that its decision to assign the Salford Quarry a toxicity value of 3 was arbitrary and capricious. We note that, although the burden was on the EPA to demonstrate the existence of toxic boron compounds at the site, National Gypsum may have been able to avoid many of its problems had *it* simply performed the additional tests to determine whether boron oxide is, indeed, the only boron compound present in the quarry.

■ The EPA points out that even with a reduction in its toxicity score, the Salford Quarry would still receive an overall score of 44.46, still in excess of the 28.5 necessary to place the site on the NPL. Of course, a reduction in the site's HRS score would change National Gypsum's *ranking* on the NPL, but we have previously declined to decide whether we would grant a petition for review solely for a recalculation of a site's HRS score when the revised score would exceed 28.5. *See Anne Arundel County, Maryland v. EPA,* 963 F.2d 412 (D.C.Cir.1992). Once again we need not reach that question because the EPA's decision to assign the Salford Quarry a persistence score of 3 was also arbitrary and capricious, and a recalculation of both the site's toxicity score and its persistence score may lead to a total HRS score below 28.5.

The persistence factor of a facility's waste characteristics score is based on the biodegradability of the most hazardous substance found at the facility. *See* 40 C.F.R. Pt. 300, App. A § 3.4. In its comments, American Olean submitted a report prepared by its expert consultant that contained a computer printout from an on-line service named "Hazardline." *See Report of O.H. Materials Corp.,* at App. C. [J.A. 257]. Under a heading entitled "CERCLA Hazard Ratings," the Hazardline report indicated that the persistence score for boron oxide was 0. Based on this report, American Olean suggested that the EPA assign the Salford site a persistence score of 0. *See American Olean Comments,* at 2. [J.A. 210].

Nevertheless, the EPA gave the site a persistence score of 3, the highest score available. The Agency explained this score in its Response Comments merely by saying that:

> Easily biodegradable compounds are assigned a value of 0, whereas the highest value, 3, is assigned to metals, which are not biodegradable, and thus persistent for HRS purposes. Because neither boron nor boron oxide is biodegradable, a persistence factor value of 3 was correctly assigned.

*EPA's Response Comments,* at 3–140. [J.A. 326]. Nowhere in its response comments does the EPA state specifically whether it based the site's persistence score on boron oxide or elemental boron. If the score was based on boron oxide, the Agency never explained why it discounted the Hazardline report indicating that boron oxide should receive a persistence score of 0. In its brief, the EPA argues that it properly determined the site's persistence score because "[n]either boron nor boron oxide is biodegradable, boron being a metalloid, inorganic substance." [Red Brief, at 18 n. 12]. The Agency has never explained, however, the basis for its conclu-

sion that metalloids deserve a persistence score of 3.

The HRS assigns a persistence score of 3 to "*metals,* polycyclic compounds and halogenated hydrocarbons." 40 C.F.R. Pt. 300, App. A § 3.4 (emphasis added). But, as the EPA acknowledges, boron is not a metal, it is a metalloid, *see* 3 MCGRAW-HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 11 (6th ed. 1987), and as a metalloid it may exhibit different properties than a metal (or a nonmetal). *See* 11 *id.,* at 59 (defining metalloid as "[a]n element which exhibits the external characteristics of a metal but behaves chemically both as a metal and as a nonmetal.... [and] may undergo reactions that are characteristic of both metals and nonmetals"). There is nothing in the HRS that permits the inference that metals should be treated the same as metalloids for persistence purposes. On the strength of the HRS alone, therefore, there is no support for the EPA's decision to assign the Salford Quarry a persistence score of 3, and since the EPA has failed to offer any further explanation, we are persuaded that the EPA acted arbitrarily in assessing the site's persistence score.

## B. *The EPA's Finding of an Observed Release*

National Gypsum also challenges the data on which the EPA based its finding of an observed release. The EPA used two sources to conclude that there had been an observed release of boron compounds: A monitoring well drilled at the site ("Monitoring Well # 2"), and a spring near the site. At both places, the Agency discovered levels of boron significantly greater than levels found in a background well.

■ According to the HRS, the EPA may find an observed release to groundwater "if a contaminant is measured (regardless of frequency) in ground water or in a well in the vicinity of the facility at a significantly ... higher level than the background level. 40 C.F.R. Pt. 300, App. A § 3.1. National Gypsum argues that Monitoring Well # 2 cannot be used as a basis for an observed release because it is actually drilled at the site not "in the vicinity" of

the site. But this ignores the portion of the HRS that says an observed release can be scored on the basis of a contaminant measured in the site's groundwater itself. Section 3.1 of the HRS says that an observed release can be scored on the basis of "direct evidence of a release of a substance of concern from a facility *to ground water* ...." That section further states that a finding of an observed release can be based on a contaminant measured *either* in groundwater *or* in a monitoring well in the vicinity of the facility. The HRS does not say that the groundwater used must be located offsite, nor does it say that the groundwater located beneath the hazardous waste is part of the "facility" from which there must be a release. Thus, as the EPA pointed out in its response comments, "the existence of groundwater contamination beyond the quarry property is not necessary to establish such a release." *EPA's Response Comments,* at 3–135. [J.A. 321].

■ National Gypsum also claims that Monitoring well # 2 could not provide reliable data since it was drilled either straight through or immediately adjacent to waste and did not have a metal "casing" protecting the entire well. Without such a casing, National Gypsum contends, the boron-containing wastes would flow directly into the monitoring well thereby artificially increasing the boron readings in groundwater tests. But as the EPA explained in its comments, National Gypsum has never brought forth evidence that a migration of the wastes actually occurred or was likely to occur. *See EPA's Response Comments,* at 3–133 [J.A. 319]. Furthermore, reports cited by the EPA show that the monitoring well was sufficiently protected from vertical migration of wastes into the well. *Id.*

Finally, National Gypsum challenges the EPA's decision to rely on boron detected in a nearby spring to support its finding of an observed release. National Gypsum argues that the spring was contaminated not by groundwater but by surface water which falls under a different section of the HRS. At oral argument, however, the EPA explained that the spring was merely

cumulative, and its finding of an observed release did not turn on the data accumulated at the spring. Consequently, since we have already upheld the EPA's finding of an observed release based on Monitoring Well #2, we need not address National Gypsum's arguments concerning the spring. We reject National Gypsum's argument that the EPA erred in finding an observed release.

## C. The Site's "Population Served" and "Quantity" Scores

■ We also reject National Gypsum's remaining challenges concerning the Salford Quarry's "population served" and "quantity" scores. The population served score represents the population placed at risk by the release of hazardous substances. See 40 C.F.R. Pt. 300, App. A § 3.5. National Gypsum asserts that the EPA improperly calculated the site's population served by including all wells drawing from the aquifer of concern within three miles of the hazardous waste site. National Gypsum contends that the EPA should have considered only the population served by the nearest well (here just one family). In support of its argument, National Gypsum points to the fact that both the population served and distance to nearest well scores are combined in the same matrix. According to National Gypsum, this illustrates the "logical necessity" that the EPA must first calculate the distance to the nearest well and then use only that well in determining the population served factor.

The HRS states that a facility's population served score is evaluated separately from its distance to the nearest well score. Only after the EPA calculates each factor are the two combined in a matrix. The HRS says:

> Population served by ground water is an indicator of the population at risk.... The well or wells of concern must be within three miles of the hazardous substances, including the area of known aquifer contamination, but the "population served" need not be. Likewise, people within three miles who do not use water from the aquifer of concern are not to be counted....

40 C.F.R. pt. 300, App. A, § 3.5. We are satisfied that this section of the HRS supports the EPA's position that population served includes all persons who draw their water from the aquifer of concern using wells located within three miles of the hazardous substances. This court's decision in *City of Stoughton* is not to the contrary. While it is true that, in discussing the population served/distance to nearest well element, the court in *City of Stoughton* mentioned only the population served by the nearest well, *see City of Stoughton*, 858 F.2d at 755, nothing in the case states that the EPA can consider only that population. In fact, we cannot tell from the case whether another well existed that served persons outside the three mile radius. Furthermore, our recent decision in *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1307 (D.C.Cir.1991), upheld a challenged population served score, emphasizing that the EPA "properly applied section 3.5 of the HRS and included within its calculations all people who draw water from wells located within three miles of the hazardous substances."

■ As for the site's "quantity" score, National Gypsum argues that the EPA erred in calculating it using boron oxide which is merely a "pollutant or contaminant" and not a "hazardous substance" as defined by CERCLA. *See* 42 U.S.C. § 9601(14). National Gypsum contends that the plain language of the HRS restricts the calculation of the quantity score to only hazardous substances found at the site. National Gypsum points to a recent amendment to the HRS that specifically includes "pollutants or contaminants" in addition to hazardous substances. National Gypsum argues that the fact that the EPA changed its regulation shows that the regulation previously in effect did not include pollutants or contaminants. We disagree.

The HRS provides that a site's hazardous waste quantity component includes "all hazardous wastes at a facility" and does not mention pollutants or contaminants. 40 C.F.R. pt. 300, App. A, § 3.4. As the EPA explained at the time it issued that

version of the HRS, however, the term hazardous waste was meant to include "those substances meeting the definition of pollutant or contaminant...." *See* 47 Fed. Reg. 31,180, 31,189 (1982). Furthermore, this court has recognized that a site is eligible for inclusion on the NPL if it contains hazardous substances *or* pollutants or contaminants even though, under section 107 of CERCLA, a facility may not be liable for cleanup of pollutants or contaminants. *Eagle–Picher I,* 759 F.2d at 931–932.

### III. CONCLUSION

Because the EPA acted arbitrarily in assessing both the site's toxicity and persistence score, we vacate the EPA's decision to list the Salford Quarry and remand for further consideration consistent with this opinion. On remand, if the EPA continues to refuse to perform further groundwater tests at the site to determine precisely which boron compounds, if any, are present there, then the Agency must, at the very least, identify which highly toxic (and presumably more than slightly soluble) boron compounds it assumes exist at the site and the EPA must offer a reasoned explanation for its assumption.

*It is so ordered.*