Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued April 7, 2004        Decided June 29, 2004

No. 02-1371

HONEYWELL INTERNATIONAL, INC. AND
EDGEWATER WORKING GROUP,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL O. LEAVITT, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

---

Consolidated with
02-1372

---

On Petitions for Review of an Order of the
Environmental Protection Agency

---

*Norman W. Bernstein* argued the cause and filed the briefs for petitioners Honeywell International, Inc. and Edgewater Working Group.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Peter J. Fontaine* argued the cause for petitioner Three Y, LLC. With him on the briefs was *Douglas W. Frankenthaler*.

*Natalia T. Sorgente*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Sheila Igoe*, Counsel, U.S. Environmental Protection Agency.

Before: GINSBURG, *Chief Judge*, and EDWARDS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In these consolidated cases, we consider two separate challenges to the Environmental Protection Agency's decision to include an industrial site bordering the Hudson River on the National Priorities List—a list of contaminated sites considered priorities for environmental cleanup. One group of petitioners, several companies potentially responsible for cleaning up the site, claims that EPA's notice of the proposed listing was deficient and that the decision to list the site is unsupported by the record. The other petitioner, an adjoining landowner whose property EPA considers part of the site, argues that EPA failed to give fair notice that the parcel might be included and that the inclusion of its land was arbitrary and capricious. Finding each of these challenges either without merit or forfeited, we deny the petitions for review.

## I.

Known as "Superfund," the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 (CERCLA), requires the federal government to compile a "National Priorities List" (NPL) of known or threatened releases of hazardous substances that are priorities for remedial action, i.e., long-term cleanup activities

designed to address the environmental dangers associated with a contaminated site. *Id.* § 9605(a)(8)(B) (2000). We have described "'the modest and limited purposes' of the NPL within the Superfund scheme" in previous cases, *Wash. State Dep't of Transp. v. U.S. EPA*, 917 F.2d 1309, 1310 (D.C. Cir. 1990) (quoting *Eagle-Picher Indus. v. U.S. EPA*, 759 F.2d 922, 932–33 (D.C. Cir. 1985) (*Eagle-Picher II*)); *accord Eagle-Picher Indus. v. U.S. EPA*, 759 F.2d 905, 919–21 (D.C. Cir. 1985) (*Eagle-Picher I*), noting that "Congress intended the EPA to employ the NPL as a tool for identifying quickly and inexpensively those sites meriting closer environmental scrutiny," *Wash. State*, 917 F.2d at 1310. Only sites placed on the NPL are eligible for Superfund-financed remedial action, *see* 40 C.F.R. § 300.425(b)(1) (2004), though listing a site does not mean that such funds will actually be forthcoming, for EPA may "pursue other appropriate authorities to remedy the release, including enforcement actions under CERCLA and other laws," *id.* § 300.425(b)(2). Listing a site, moreover, neither requires the owner or operator to take any action nor assigns liability to any party. *See Anne Arundel County v. U.S. EPA*, 963 F.2d 412, 413 (D.C. Cir. 1992). Once a site is listed, EPA determines cleanup responsibilities in other proceedings. *See* 42 U.S.C. § 9607 (2000).

The principal tool EPA uses for determining whether to list a site on the NPL is known as the Hazard Ranking System, or HRS. *See* 40 C.F.R. pt. 300, App. A (HRS). The HRS evaluates four "pathways," i.e., routes, through which hazardous substances can migrate—ground water, surface water, soil exposure, and air. HRS § 2.1. For each pathway, EPA considers, among other factors, the likelihood that hazardous substances will be released, the waste characteristics of those substances (e.g., toxicity, mobility), and the potentially threatened population or environmental targets (e.g., wells, animal habitats). *Id.* § 2.1.3. Employing HRS formulas and assumptions, EPA evaluates the relevant factors and then assigns each site a value from 0 to 100. *Id.* § 2.1.1. Sites scoring 28.5 or higher may be added to the NPL. *Eagle-Picher I*, 759 F.2d at 910 n.17.

This case involves EPA's listing of an industrial site in Edgewater, New Jersey. *See* National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 35, 66 Fed. Reg. 2380 (Jan. 11, 2001) (Proposed Rule); National Priorities List for Uncontrolled Hazardous Waste Sites, 67 Fed. Reg. 56,757 (Sept. 5, 2002) (Final Rule). Known as the Quanta Resources site, the property lies on the western shore of the Hudson River, directly across from New York City at 96th Street. Until 1974, Allied Signal (and its predecessors), later acquired by petitioner Honeywell International, used the property for coal tar processing. As the successor to the coal tar facility operator, Honeywell is potentially responsible for cleaning up the site. *See* 42 U.S.C. §§ 9604(a)(1) (2000), 9607(a). In the late 1970s, the Quanta facility was used for oil storage and recycling, housing over sixty storage tanks. In 1981, after discovering contaminated oil and other hazardous substances in the area, the New Jersey Department of Environmental Protection closed the facility. Although EPA supervised a series of removal actions to clean and decontaminate the area, later sampling revealed the continued presence of hazardous substances. A Removal Site Investigation (RSI), conducted pursuant to an EPA administrative consent order, discovered that ground water, soil, and river sediments contained arsenic, chromium, lead, polynuclear aromatic hydrocarbons, and other compounds. The investigation also documented an observed release of heavy end coal tar product (consisting of hard, solid coal tar pitch, sticky coal tar roofing pitch, and viscous, oil-like coal tar) both on the property and in the Hudson.

Using the HRS, EPA scored the site and reported its findings in the HRS Documentation Package. Among other things, EPA determined that the portion of the Hudson River adjacent to the site contained a fishery, the contamination of which posed a threat to the human food chain. EPA assigned a score of forty-five to this threat—a component of the surface water pathway score. *See* HRS § 4.1.3.3.1. EPA scored none of the other pathways, explaining that they would have had no effect on the overall site score. Hazardous Ranking System Documentation Package: Quanta Resources (Dec. 2000), J.A. 360 [hereinafter HRS Documentation Package]. After additional calculations, the surface water path-

way score produced an overall score of fifty, making the site eligible for placement on the NPL.

In a Proposed Rule published in the *Federal Register* in January 2001, EPA announced its intention to list the Quanta site on the NPL. 66 Fed. Reg. at 2385. After considering comments opposing the listing and finding no basis for changing the HRS score, EPA published a Final Rule that added the site to the NPL. 67 Fed. Reg. at 56,760. Although neither the Proposed Rule nor the Final Rule provided a precise geographical description of the site, the HRS Documentation Package identified the site as located at "163 River Road" and "bordered to the north by the Celotex Industrial Park, to the south by the former Spencer-Kellogg Industrial Park, to the west by River Road, and to the east by the Hudson River." HRS Documentation Package, J.A. 359.

This case involves two separate challenges to the Quanta Resources NPL listing. The first, brought by Honeywell International and the Edgewater Working Group, several companies connected to the site's waste oil recycling operations, claims that (1) EPA failed to provide proper notice and a meaningful opportunity to comment on the proposed listing, and (2) the agency's fishery determination is unsupported by substantial evidence. Throughout this opinion, we shall refer to petitioners Honeywell and the Edgewater Working Group collectively as "Honeywell." The other petition for review comes from Three Y, LLC, which owns an adjoining parcel of land that EPA included as part of the Quanta NPL site. Three Y argues that (1) the Proposed Rule and associated documents failed to give fair notice that the company's property might be included, and (2) EPA's final decision to include the property was arbitrary and capricious. We consider each petition in turn.

## II.

Under the Administrative Procedure Act, a notice of proposed rulemaking must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988); *see* 5 U.S.C. § 553(b) (2000). Honeywell argues that the Proposed Rule fails this test because it nowhere mentioned what the company suspects is

EPA's primary reason for listing the site, i.e., to obtain Superfund monies to dredge the Hudson, a remedial action that Honeywell claims could pose serious environmental risks. EPA's failure to reveal its real objective, Honeywell contends, deprived the company of a "public outcry" that "almost certainly would have occurred" had the public known that EPA planned to dredge the Hudson. Honeywell's Reply Br. at 3.

Honeywell's argument fails for a simple reason: under the law of this circuit, EPA has no obligation to discuss potential response actions—like dredging—when listing a site on the NPL. In *Eagle-Picher Industries v. U.S. EPA*, we explained that "[t]he NPL is simply the first step in a process—nothing more, nothing less" and credited EPA's assertion that "the NPL is not in itself remedial action—inclusion on the NPL requires no cleanup nor any other action by site owners." *Eagle-Picher II*, 759 F.2d at 932. As we recognized in a related case bearing the same name, "[t]he major purpose of the NPL and the HRS ... is narrowly focused. It is to identify, quickly and inexpensively, sites that may warrant further action under CERCLA. Listing does not represent a determination that action is necessary, or that the EPA will take action." *Eagle-Picher I*, 759 F.2d at 911. EPA explained the limited function of an NPL listing in its response to Honeywell's comments on the Proposed Rule: "EPA's exploration of response options is unrelated to the HRS site score. The HRS documentation package does not necessarily include an evaluation of every possible concern at a site nor does it make any suggestion as to response actions to be taken at a site." Support Document for the Revised National Priorities List: Final Rule–2002, J.A. 1208 [hereinafter Support Document]. In other words, listing a site does nothing more than identify it as sufficiently contaminated to warrant potential remedial action. *See Wash. State*, 917 F.2d at 1310. Because the notice did just that, it complied with the APA.

Honeywell calls our attention to *Anne Arundel County v. U.S. EPA*, in which we vacated and remanded an NPL listing because EPA failed to provide certain information in the proposed rule. 963 F.2d at 413. In that case, however, we

found the notice deficient because it omitted information that could have altered the HRS site score. *Id.* at 418–19. Here, the omitted information about a potential remedial action would have had no effect on the HRS score.

Not only did EPA have no obligation to disclose remedial options at this stage, but even if, as Honeywell alleges, the agency listed the site because it eventually plans to dredge the Hudson, the company has suffered no prejudice. Before dredging or undertaking any other remedial action, CERCLA requires EPA to publish its proposed plans for comment. *See* 42 U.S.C. § 9613(k)(2) (2000). So if EPA ultimately decides to dredge the river, Honeywell and other interested parties will have an opportunity to raise their concerns.

Honeywell next challenges the HRS score. Specifically, it contends that EPA's finding that the section of the Hudson bordering the Quanta site contains a fishery is unsupported by the record and thus arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) (2000) (providing that a court will set aside an agency finding that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

When evaluating the surface water pathway, as it did here, EPA considers (among other things) whether a threat to the human food chain exists. HRS § 4.1.3. That inquiry focuses not on whether water is contaminated, but on whether contamination is present in aquatic organisms that humans consume. To answer that question, EPA determines whether a fishery exists in the area, and if so, assigns a score according to (1) whether the fishery is "subject to actual or potential . . . contamination" and (2) whether "a portion of the fishery is within the boundaries of the observed release" of hazardous substances. *Id.* § 4.1.3.3.

Although the HRS regulations explain how contamination will be assessed, they neither define "fishery" nor specify what evidence is needed to determine whether a fishery actually exists. EPA's HRS Guidance Manual answers both questions. The Manual defines fishery as "[a]ny area of a surface water body from which human food chain organisms are taken or could be taken for human consumption." Haz-

ardous Ranking System Guidance Manual 294 (Nov. 1992) [hereinafter HRS Guidance Manual], Resp't's Br. Ex. B, *available at* http://www.epa.gov/superfund/sites/npl/hrsres/ hrsgm/ch8b.pdf. A fishery exists if "[h]uman food chain organisms are present in the surface water body; and [s]ome attempt has been made to catch those human food chain organisms." *Id.* (emphasis omitted). To make these determinations, "[u]seful sources of information include state and local fish and wildlife agencies, local bait and tackle shops, visual observation during the [site investigation] of individuals fishing or of past fishery activity (e.g., fishing lines and hooks left behind near the surface water body)." *Id.* at 295. If such evidence demonstrates the existence of a fishery, then EPA determines whether the fishery is subject to "actual or potential . . . contamination." HRS § 4.1.3.3. "Actual contamination" exists if a hazardous substance is present in the observed release and—the issue in this case—"at least a portion of the fishery is within the boundaries of the observed release (that is, it is located either at the point of direct observation or at or between the probable point of entry and the most distant sampling point establishing the observed release)." *Id.*

In this case, EPA relied on two sources of information to conclude that a fishery exists in the area of the river where the heavy end coal tar product release had been observed. First, the contractor performing the HRS evaluation spoke with Bill Andrews, a biologist employed by the New Jersey Department of Environmental Protection's Bureau of Marine Fisheries. Andrews informed the contractor that "the area of the Hudson River bordering Edgewater, NJ (which includes the Quanta Resources site) is fished for human consumption." Phone Conversation Record (Sept. 5, 2000), J.A. 905. Also, Andrews's records indicated that "a gillnetter . . . fishes this area for American Shad," and that several other species are "fished for human consumption from the area adjacent to the Quanta Resources site," including "striped bass, white perch, white catfish, blue crab, tomcod, American eel, and winter flounder." *Id.* Second, the contractor spoke with Jorge Quinones who worked at the Quanta site as a representative of a Superfund technical assessment and response team.

Quinones reported that he had "observed people fishing off the pier immediately north of the site." Interview Log (Aug. 24, 2000), J.A. 906. He marked the location on a map—a location that, according to EPA, lies approximately fifty feet from the contaminated waters.

Honeywell argues that the information Andrews and Quinones provided amounts to hearsay and is therefore insufficient to demonstrate the existence of a fishery within the boundaries of the observed release. In particular, it claims that EPA should have verified Andrews's statements by obtaining his records, the frequency and dates of fishing in the area, and the name of the gillnetter. Circuit law, however, makes abundantly clear that "administrative agencies may consider hearsay evidence as long as it 'bear[s] satisfactory indicia of reliability.'" *EchoStar Communications Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002) (alteration in original) (quoting *Crawford v. U.S. Dep't of Agric.*, 50 F.3d 46, 49 (D.C. Cir. 1995)). Furthermore, "hearsay can constitute substantial evidence if it is reliable and trustworthy." *Id.* Because Honeywell points to nothing suggesting that the information provided by either Andrews or Quinones was unreliable, and given Andrews's and Quinones's positions (a biologist working for New Jersey's Bureau of Marine Fisheries and a member of a Superfund technical assessment and response team), EPA's reliance on their statements was neither arbitrary nor capricious. As we said of a different agency in another case, EPA was "entitled to rely on . . . representations by parties who were uniquely in a position to know the [relevant information]." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984); *see also EchoStar*, 292 F.3d at 752–53 (rejecting petitioner's claim that an uncorroborated and untested statement upon which the agency relied cannot constitute substantial evidence where the statement was given under oath, the affiant had personal knowledge of the facts, and the petitioner submitted no contradictory evidence).

Honeywell argues that nothing in the record indicates that Andrews was aware of the boundaries of the observed release. The contractor's notes, however, expressly refer to

"the area of the Hudson River bordering Edgewater, NJ (which includes the Quanta Resources site)." Phone Conversation Record, J.A. 905. True, the notes do not indicate whether the contractor actually gave this description to Andrews, but absent evidence to the contrary, we cannot imagine that an EPA contractor investigating whether a fishery exists within the boundaries of the observed release would have failed to inform Andrews of the release's boundaries.

Honeywell has two specific objections to the information Quinones supplied. The company claims first that his observation fails to support EPA's determination regarding the species of fish caught for human consumption. But given Honeywell's concession that Andrews's statement, if reliable, supports the HRS documentation regarding the specific species of fish, *see* Honeywell's Br. at 21, and because we have concluded that Andrews's statement is in fact reliable, *see supra* p. 9, we need not address this concern.

Second, Honeywell argues that Quinones's observation fails to demonstrate that fishing occurred *within the boundaries* of the observed release. This is true, but EPA rules require only that fish "could be taken for human consumption," which the agency can demonstrate by documenting the presence of fish in the contaminated area and "[s]ome attempt" to catch them. HRS Guidance Manual at 294, Resp't's Br. Ex. B. EPA documented both. Relying on the Andrews interview, EPA concluded, properly as we have indicated, that fish were present in the contaminated area. EPA also found "some attempt" to catch the fish, relying on (1) Quinones's observation, together with the hardly unreasonable assumption that fish can travel the fifty feet from the contaminated area to the pier where Quinones observed fishing activity, and (2) Andrews's statement that a gillnetter fished in the area. Honeywell offers no basis for questioning either conclusion. The company asserts that in responding to its comments, EPA failed to explain the assumption regarding the movement of fish from the contaminated waters to the area of observed fishing. We see no reason to disturb EPA's rule, however, because although we "may not supply a reasoned basis for the agency's action that the agency itself has not

given," we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations and internal quotation marks omitted); *see also Domtar Me. Corp. v. FERC*, 347 F.3d 304, 312 (D.C. Cir. 2003). That is the situation here.

Our decision in *National Gypsum Co. v. U.S. EPA*, 968 F.2d 40 (D.C. Cir. 1992), on which Honeywell relies, presented a situation very different from the one we face here. In that case, EPA based an HRS score on the presence of a highly toxic boron compound. Because a study showed that the site contained only a low toxicity boron compound, we vacated the NPL listing. *See id.* at 42–43. Here, Honeywell points to nothing in the record that calls into question EPA's conclusion that a fishery exists within the boundaries of the observed release. Although the evidence supporting EPA's fishery determination is admittedly thin, the agency made the specific findings required by its rules and regulations, and it offered a "satisfactory explanation for its inference" that the site contains a fishery within the contaminated waters. *Id.* at 44; *see also Burlington N. R.R. Co. v. Surface Transp. Bd.*, 114 F.3d 206, 210 (D.C. Cir. 1997) (denying a petition for review when "[the agency's] findings rest on such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and the agency has articulated a rational connection between the facts found and the [decision] made" (citations and internal quotation marks omitted)).

## III.

In its petition, Three Y challenges the inclusion of its parcel of land as part of the Quanta site, arguing that "EPA failed to give fair notice to interested parties that it intended to include the Parcel as part of the Site and the data that EPA relied upon to list the Site indicates that Site-related contaminants do not extend to the Parcel." Three Y's Br. at 7. Acknowledging that it submitted no comments during the rulemaking process, Three Y urges us to excuse its failure

because the Proposed Rule gave no indication that the property might be included. *See Fla. Power & Light*, 846 F.2d at 771 (stating that agency notice must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully"); *cf. Fertilizer Inst. v. U.S. EPA*, 935 F.2d 1303, 1311–12 (D.C. Cir. 1991) (remanding an agency rule for a new round of notice and comment where the proposed rule failed to provide notice of a provision in the final rule). For its part, EPA insists that the proposed listing was adequate to put Three Y on notice that its property might be included, and that by failing to comment, Three Y forfeited its substantive challenge to the listing. *See Dep't of Transp. v. Public Citizen*, No. 03-358, 2004 WL 1237361, at *9 (June 7, 2004) (noting that petitioner forfeited particular challenges to an agency action when it failed to object to the action on those particular grounds); *cf. Wash. State*, 917 F.2d at 1312 (denying a petition for review as untimely when a petitioner who was "on notice that its property *might be considered* part of the [NPL] listing" had not filed a petition for judicial review within the ninety-day statutory period (emphasis added)). On the merits, EPA argues that including Three Y's parcel was well supported by record evidence. We begin with the notice issue, for if EPA is correct, we will have no need to address Three Y's substantive challenge. *See Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (noting that "[a]bsent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue" (citation and internal quotation marks omitted)).

Before delving into the relevant documents and the parties' arguments, we think a little geography will be helpful. Recall that the Quanta site is bounded on the east by the Hudson River, on the north by the Celotex Industrial Park, and on the south by the former Spencer-Kellogg Industrial Park. The dispute regarding whether Three Y should have known that its property might be included in the Quanta site centers on the western boundary, and in particular, on two north-south running roads—each at one time or another known as River Road—that lie on the NPL site's western side. The

original River Road, previously known as "River Road" and now officially known as "Old River Road," lies immediately west of Three Y's parcel. In the mid–1990s, a new River Road, officially known as "River Road," was built east of the original River Road. Three Y's parcel lies between these two River Roads—a Mesopotamia of sorts—bordered on the west by the old road and on the east by another parcel known as Lot 3 which abuts the new River Road. Both parties agree that Lot 3 is part of the Quanta NPL site.

Although the Support Document for the Final Rule identifies the site's western border as "Old River Road," Support Document, J.A. 1197, thus clearly encompassing Three Y's parcel, Three Y contends that the Proposed Rule and related documents indicate that the site's western boundary lies just west of the *new* River Road. This, Three Y argues, led it to believe that its property would not be included and that it therefore had no reason to comment on the proposed listing. EPA reads the same documents very differently. It argues that like the Support Document, these documents make clear that Old River Road serves as the site's western boundary, thereby putting Three Y on notice that its property could be included.

We start with the Proposed Rule. In addition to listing "Quanta Resources" as the "Site name" and identifying the city and state as Edgewater, New Jersey, 66 Fed. Reg. at 2385, the Proposed Rule explains that NPL site boundaries are not precisely defined:

> When a site is listed, the approach generally used to describe the relevant release(s) is to delineate a geographical area (usually the area within an installation or plant boundaries) and identify the site by reference to that area. As a legal matter, the site is not coextensive with that area, and the boundaries of the installation or plant are not the "boundaries" of the site. . . . In other words, while geographic terms are often used to designate the site (e.g., the "Jones Co. plant site") in terms of the property owned by a particular party, the site properly understood is not limited to that property (e.g., it may

extend beyond the property due to contaminant migration), and conversely may not occupy the full extent of the property (e.g., where there are uncontaminated parts of the identified property, they may not be, strictly speaking, part of the "site").

*Id.* at 2381.

Other documents provide more detail. Both the HRS Documentation Package and the "Listing Notice," a narrative summary of the proposed NPL site, describe the site as "located at 163 River Road" and bordered "to the west by River Road." HRS Documentation Package, J.A. 359; National Priorities List Proposed Rule #35: Narrative Summaries (Jan. 2001), J.A. 992 [hereinafter Listing Notice]. Although Three Y could well have understood the reference to "River Road" to mean the new River Road, both documents go on to describe the "heavy end coal tar product" discharge as extending "from the area west of where the *new* River Road exists to approximately 750 feet into the Hudson River." HRS Documentation Package, J.A. 368 (emphasis added); Listing Notice, J.A. 992 (emphasis added). According to EPA, this demonstrates that it used the label "new River Road" when it wished to refer to the new road, so when it used the name "River Road" in the same document, it meant Old River Road. Even though EPA (for whatever reason) did not use the roads' official names, we think this explanation makes sense, particularly since Three Y's interpretation would mean that EPA called the new River Road by two different names in the same document.

The RSI Report supports EPA's position. Describing the Quanta Resources area, that document states that "the (old) River Road borders the property to the west. The new River Road is located east of the former location, bisecting the Quanta Property." Removal Site Investigation Report—Revision 1: Quanta Resources Site (June 2000), J.A. 51. Like both the HRS Documentation Package and the Listing Notice, the RSI Report uses the term "new River Road" rather than the official name "River Road" when referring to the new road. It also clearly indicates that the property's western border is "(old) River Road," thus encompassing Three Y's parcel.

Pointing to a different part of the RSI Report, Three Y argues that the identified contamination west of the new River Road extends only to Lot 3, the portion of the land lying between the two River Roads that it does not own. Although EPA characterizes the RSI Report differently, even were Three Y correct, the Report's description of the western boundary as "(old) River Road" put Three Y on notice that its parcel might nevertheless be considered part of the site.

In a motion to supplement the administrative record, Three Y calls our attention to a letter from EPA which, according to Three Y, shows that EPA itself did not consider the Three Y property to be part of the Quanta site. The letter, however, is dated April 10, 2001, nearly one month after the comment period closed, so it could not have given Three Y any reason for believing that its parcel might not be included.

In sum, the Listing Notice, the HRS Documentation Package, and the RSI Report, taken together, put Three Y on notice that its parcel might be included within the Quanta NPL site. Because Three Y failed to submit comments challenging the inclusion of its property, it has forfeited that challenge here.

## IV.

We have considered all petitioners' remaining arguments and, finding them without merit, we deny the petitions for review.

*So ordered.*