United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

**No. 14-1290**

**September Term, 2020**

FILED ON: NOVEMBER 13, 2020

TROY CHEMICAL CORPORATION,
                PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
                RESPONDENT

———

On Petition for Review of a Final Rule of the
United States Environmental Protection Agency

———

Before: WILKINS and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

**J U D G M E N T**

This petition for review of a decision of the Environmental Protection Agency was presented to the Court, and briefed and argued by counsel. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. CIR. RULE 36(d). For the reasons stated below, it is

**ORDERED and ADJUDGED** that the petition be **DISMISSED**.

In September 2014, the Environmental Protection Agency ("EPA") published a final rule listing an area encompassing Troy Chemical Corporation, Inc. ("Troy")'s manufacturing facility on the National Priorities List ("NPL") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, 79 Fed. Reg. 56,515 (Sept. 22, 2014).

The NPL is a list of hazardous waste sites that are high priorities for remedial action due to their "relative risk or danger to public health or welfare or the environment." 42 U.S.C. § 9605(a)(8)(A). To inform its listing decisions, EPA created the Hazard Ranking System ("HRS"). The HRS is a scientific and mathematical model that "serves as a screening device to evaluate the potential for releases of uncontrolled hazardous substances to cause human health or environmental damage." 40 C.F.R. pt. 300, App. A, § 1.0. "In order to evaluate a waste site using the HRS, the EPA first identifies the sources of contamination, the hazardous substances associated with these sources, and the pathways potentially threatened by these hazardous substances." *Carus*

*Chem. Co. v. EPA*, 395 F.3d 434, 437 (D.C. Cir. 2005) (internal quotations and alterations omitted). The HRS lists four possible pathways: air migration, soil exposure and subsurface intrusion, ground water migration, and the one relevant to this case, surface water migration. *See* 40 C.F.R. pt. 300, App. A, § 2.1.

For each pathway deemed potentially affected in light of conditions at the site, EPA calculates a score by measuring three so-called factor categories: (1) waste characteristics; (2) likelihood of release; and (3) targets, which may include an individual, a human population, resources, and sensitive environments. *See Carus Chem.*, 395 F.3d at 437.

Each of these factor categories is measured by scoring various subfactors. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 310 (D.C. Cir. 2018). Two of the subfactors used to measure the target factor category are relevant to this case: the wetland-rating subfactor and the food chain individual subfactor. If a wetland from 0.1 to 1 mile long is in an area on the site contaminated by mercury, the wetland-rating subfactor is assigned a score of 25. *See* 40 C.F.R. pt. 300, App. A, §§ 2.5.1, 4.1.4.3.1.1–2 & Tbl. 4-24. If there is an observed release of mercury from the site to a watershed that connects to a fishery within 15 miles of the site, the food chain individual subfactor is assigned a score of 20. *Id.* §§ 4.1.1.2, 4.1.3.3.1. Each of these scores is used to calculate a numerical score for the target factor category. The target factor score and the scores assigned to the other factor categories are used to calculate a score for the surface water migration pathway. The score for the surface water migration pathway and the scores assigned to the other pathways are then used to calculate an overall numerical score for the site. The site score can range from 0 to 100, *id.* § 2.1.1, and if the score is 28.50 or higher, the site is eligible for listing on the NPL. *See CTS Corp. v. EPA*, 759 F.3d 52, 56 (D.C. Cir. 2014).

From the mid-1950s to 1987, the facility currently operated by Troy in Newark, New Jersey, produced mercury compounds. That process generated mercury-bearing wastewater. Until 1976, the facility dumped that wastewater directly into Pierson's Creek, a perennial creek that runs south of Troy's facility and into the Port Newark Channel. Troy itself estimates that at least 7,300 pounds of mercury remain in the creek sediments.

In 2011, then-Governor Christie nominated Troy's facility and an adjacent segment of Pierson's Creek for listing on the NPL. EPA visited the site three times—in December 2011, March 2012, and October 2012—to collect information. Based on sediment samples taken from the creek, EPA determined that a portion of the creek and its banks is contaminated by mercury, and that there was an observed release of mercury into the creek. EPA also determined that Pierson's Creek connects to a fishery within 15 miles of Troy's facility, and therefore assigned the HRS food chain individual subfactor a score of 20.

EPA also found a wetland extending for 0.15 miles along the mercury-contaminated segment of Pierson's Creek. An EPA team, led by a wetland expert, visited the site in October 2012 to take soil borings, and, at the site of each boring, documented the dominant plant species, the presence or absence of wetland hydrology indicators, and the presence or absence of hydric soil indicators. EPA's wetland expert also made visual observations of the area surrounding Pierson's Creek.

Based on the soil borings and his observations, EPA's wetland expert marked what he determined to be the boundaries of the wetland with flags, and mapped the wetland using GPS. By comparing its map of the wetland to a map of the zone of contamination, EPA determined that the wetland and the zone of contamination overlapped by 0.15 miles, and therefore assigned the HRS wetland-rating subfactor a score of 25.

Based on the food chain individual and wetland-rating subfactors, and others, EPA calculated a surface water migration pathway score of 100. That score was sufficient to bring the total site score to 50. Since a site is eligible for listing if its score is 28.50 or higher, EPA did not calculate scores for the other pathways. In December 2013, EPA published a proposed rule listing the site on the NPL and invited public comment. 78 Fed. Reg. 75,534 (Dec. 12, 2013).

In September 2014, EPA published a final rule listing the site on the NPL. 79 Fed. Reg. 56,515 (Sept. 22, 2014). In response to comments (including Troy's) not relevant here, EPA lowered the final site score to 47.99.

On December 18, 2014, Troy timely petitioned for review of the listing. Petition for Review (Dec. 18, 2014); *see* 42 U.S.C. § 9613(a). At the request of the parties, we held this case in abeyance until June 25, 2019. *See* Per Curiam Order (June 25, 2019).

Troy petitions for review of the listing on four grounds. First, Troy argues that EPA has failed to substantiate its finding that the wetland within the zone of contamination is 0.15 miles long. Troy notes that several of the soil borings along the creek were not found to exhibit wetland characteristics, including SB-2, SB-3, SB-5, SB-6, and SB-8; it notes that there are "sizeable gaps" between two of the soil borings that EPA determined to be within the wetland—SB-4 and SB-7—and between SB-7 and the flag location—F-14—marking the northernmost end of the wetland; and it notes that the region through which the creek runs has been "subject to a significant amount of industrialization and filling." Petitioner's Reply Brief at 16. These facts, according to Troy, imply that the wetland may be intermittent. Nothing in the final record, Troy asserts, addresses how EPA determined that the wetland is, in fact, continuous, and that it extends for 0.15 miles. Troy also argues that EPA has failed to adequately address evidence that contradicts its wetland delineation. Troy asserts, and EPA does not dispute, that if the wetland within the zone of contamination is in fact less than 0.1 miles long, the total site score would fall below 28.50, and the site would be ineligible for listing.

Because CERCLA does not provide a standard of review applicable to the issue of whether EPA erred in listing a site on the NPL, this Court reviews EPA's listing decisions under the substantial evidence and arbitrary and capricious standards of the Administrative Procedure Act ("APA"). *See Genuine Parts Co.*, 890 F.3d at 311.

Troy does not clear the high bar to overturn EPA's wetland delineation under substantial evidence review. EPA's wetland expert's visual observations and analysis of soil borings, plant species, wetland hydrology indicators and hydric soil indicators constitute substantial evidence of EPA's wetland delineation. *See CTS Corp*, 759 F.3d at 61 ("Nothing in CERCLA or principles of

administrative review obligated the EPA to run the gauntlet of test methodologies [to determine the existence of a factual predicate] before listing the site."). While several of the soil borings did not exhibit wetland characteristics, agency records indicate that those borings were upslope from the wetland itself. EPA may accordingly infer, from the borings and its wetland expert's observations, that the wetland is continuous across the relevant area. *See, e.g.*, *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187 (D.C. Cir. 1990) ("It is not the court's role to second-guess the scientific judgments of the EPA, and the Administrator may apply his expertise to draw conclusions from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as 'fact,' and the like." (internal quotations and alterations omitted)).

Troy also fails to show that EPA's wetland delineation is undermined by contradictory evidence. Troy points to a 2006 letter from the New Jersey Department of Environmental Protection ("NJDEP") in which, according to Troy, the NJDEP asserts that there is no wetland where EPA found one. As Troy admits, the letter's determinations were only legally valid for five years, and so expired in 2011. *See* Petitioner's Reply Brief at 12. And even if the letter were still legally valid and said what Troy claims, EPA's wetland delineation would stand. "Under the substantial evidence test, it is not necessary that all the evidence, or even most of the evidence, point in one direction." *Env't Def. Fund v. EPA*, 598 F.2d 62, 85 (D.C. Cir. 1978). Rather, "[i]t suffices that EPA's conclusions are supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusions." *Id.* at 90 (internal quotations and alterations omitted).

For the same reason, EPA's wetland delineation is not undermined by a note in the wetland expert's field logbook explaining that SB-9—a soil boring that the expert determined to mark the boundary of the wetland, and that did not meet wetland vegetation or hydrology criteria, but did meet the hydric soil criterion—"is characteristic of this entire wetland, both sides of Pierson's Creek (phragmites, wet area-floods), at southern end of this open section (Conrail and Engelhard)." J.A. 408. "That the evidence in the record may also support other conclusions, even those that are inconsistent with the Administrator's, does not prevent us from concluding that his decisions were rational and supported by the record." *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980).

Second, Troy argues that EPA failed to comply with notice-and-comment requirements by not providing in its notice of proposed listing information about the locations of soil borings used to delineate the wetland, or photographs to demonstrate the vegetation and other physical characteristics of the wetland. In its final listing, EPA did provide this information.

The APA requires an agency to publish "notice" of "either the terms or substance of the proposed rule or a description of the subjects and issues involved," in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c). This requirement obligates EPA to reveal the technical studies and data upon which it relied in its rulemaking. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

"The failure to disclose for public comment is subject, however, to the rule of prejudicial error . . . ." *Id.* at 236 (internal quotation omitted). This Court will not set aside a rule unless the party challenging it can point to inaccuracies in the data on which the agency relied, "show that the agency hid or disguised the information it used, or otherwise conducted the rulemaking in bad faith, or indicate with reasonable specificity what portions of the data it objects to and how it might have responded if given the opportunity." *Chamber of Com. v. SEC*, 443 F.3d 890, 904 (D.C. Cir. 2006) (internal quotations and alterations omitted).

Troy fails to show prejudice because it has not identified how it would have responded to the photographs and the locations of the soil borings—to which it has now had access for over five years—other than by arguing that the distance between the soil borings undermines EPA's finding that there are 0.15 miles of continuous wetland within the zone of contamination. As we explained above, this argument fails in light of EPA's analysis of the plant species, wetland hydrology indicators and hydric soil indicators at the site, all of which Troy had access to at the time of EPA's proposed listing. *See* Petitioner's Brief at 16. As Troy fails to demonstrate prejudice, we need not determine whether EPA failed to comply with notice-and-comment requirements.

Third, Troy argues that EPA's interpretation of the HRS food chain individual subfactor is inconsistent with CERCLA. Troy, however, does not dispute that EPA followed the relevant sections of the HRS to the letter. *See* Petitioner's Brief at 28–37; Petitioner's Reply Brief at 16–24. EPA is therefore correct that Troy's quarrel is not with EPA's interpretation of the HRS, but with the HRS itself. Troy forfeited any challenge to the HRS itself by failing to adequately raise it in its opening brief. *See, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

Finally, Troy argues that EPA's food chain individual subfactor score is unsubstantiated because EPA did not adequately respond to Troy's comments explaining why there is no potential for mercury to migrate from Pierson's Creek to Newark Bay or New York Harbor and thereby enter the human food chain. Troy's comments asserted that mercury released into the creek would rapidly settle into the creek sediments; that the creek has little or no mean flow; and that even if mercury-laden sediment did migrate from the creek into the Port Newark Channel, it would be removed by the Army Corps of Engineers, which frequently dredges the channel, and that therefore the mercury in Pierson's Creek is unlikely to migrate. Troy does not dispute the factual predicates for EPA's food chain individual subfactor score—*i.e.*, that EPA established an observed release of mercury to surface water in Pierson's Creek, that mercury has a bioaccumulation potential factor value of 50,000, and that there is at least one fishery within 15 miles of Troy's facility. *See* Petitioner's Reply Brief at 16–22.

Troy fails to demonstrate that EPA lacked substantial evidence for its food chain individual subfactor score. EPA adequately responded to Troy's comments in its final listing by explaining that "during storm events contaminated sediments will migrate from Pierson's Creek into the Port Newark Channel," and that "the mercury contaminated sediments in Pierson's Creek are uncontained and can continue to migrate into Port Newark Channel and continue to pose a threat to the downstream fishery" regardless of dredging by the Army Corps of Engineers. J.A. 208–09.

And in any event, this Court held long ago that HRS scoring determinations are not arbitrary or capricious so long as EPA has offered a reasoned explanation for the assumptions and methodology it relied upon in creating the relevant components of the HRS model. *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 921–22 (D.C. Cir. 1985). Here, EPA has offered a reasonable explanation for the HRS's assumptions about the mobility of hazardous substances in surface water. *See* 53 Fed. Reg. 51,962, 51,968 (Dec. 23, 1988) (explaining that EPA did not consider adding a mobility factor to the surface water migration pathway in its revisions to the 1982 version of the HRS, because "[a]lthough the surface water pathway has no mobility factor per se, the persistence factor addresses this issue, as would the proposed bioaccumulation factor in the human food chain calculations and the proposed dose adjusting factor in the recreation calculations").

Because we find that none of Troy's arguments is meritorious, we deny its petition for review of EPA's listing.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

## Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk